IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JIMMY DWAYNE RUSSELL                                                    PLAINTIFF


        v.                              Civil No.    14-5168


SHERIFF TIM HELDER; and
DR. NEIL MULLINS                                                       DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

        Plaintiff is currently incarcerated in the Varner Unit of the Arkansas Department of

Correction (ADC).   The events subject to this action occurred while the Plaintiff was

incarcerated at the Washington County Detention Center (WCDC).  He names as Defendants

Sheriff Tim Helder and Dr. Neil Mullins.

        Plaintiff maintains his constitutional rights were violated when he was denied adequate

medical care in connection with an infection on his right calf and face.  He has sued the

Defendants in both their individual and official capacities.

        Defendants filed a Summary Judgment Motion on October 19, 2015 (Docs. 55-57).  A

hearing was held on December 3, 2015, to allow the Plaintiff to testify in response to the Motion.

During the hearing, it was determined that it would be necessary to hear the testimony of Dr.

Neil Mullins and Dr. Howard.  A supplemental hearing was held on January 7, 2016.  At the

hearing, the parties were directed to provide the Court with some additional affidavits and

-1-

records.   Those documents have been filed (Docs. 71-73).   The Motion is now ready for decision.

### 1.  Background

Plaintiff was incarcerated in the WCDC from March 25, 2014, until August 14, 2015. He was in pretrial status until August 6, 2015.

Plaintiff testified that in May of 2014, he developed a boil on his leg as a result of contracting what he believed was a Methicillin-resistant staphylococcus aureus (MRSA) infection.  The boil developed on the inner calf of his right leg.  Plaintiff testified he submitted his first medical request for treatment of the boil on May 14th.  Medical requests are submitted via electronic kiosk located in the pod.  He indicated his whole leg was swollen and the "pain [was] beyond belief."  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A-1 at 117.[1]  He was seen by Nurse Bradley the following day and started on Cephalexin, an antibiotic, and Ibuprofen, for the pain.  *Id.* at 62.  Plaintiff testified he was not told when he would be seen by the doctor.

Dr. Mullins testified that he had been the jail doctor at the WCDC for a couple of years until November of 2014.  He alternated with Dr. Howard in seeing patients.  Dr. Mullins was at the WCDC one day every other week.  In between his visits, Dr. Mullins indicated jail staff could contact him by phone.

Dr. Mullins testified that when inmates were booked in and were on medication, they were seen by the nurse and the nurse would call the doctor to see if the medication could be continued.  If necessary, Dr. Mullins stated he could make a special trip to the WCDC but he did not do this on many occasions.

---

[1]Page citations to this exhibit are to the jail file page number contained in the bottom center of the page.

According to Dr. Mullins, staph is merely one type of bacteria that can be present when there is an infection.   He testified any skin infection could be a staph infection.  He also noted that everyone has staph bacteria on their skin.  To properly diagnose a staph infection, a culture would have to be taken.  A staph infection is contagious if it is an open sore and not covered.

Dr. Mullins testified he only did cultures in cases of serious infections when no progress is being made with antibiotics.  He indicated that once an infection is healed, there are no long term effects.  He testified that any skin infection can leave a scar.  He stated that scars typically come from a bigger area of infection or one that requires opening up and debriding.

Dr. Mullins testified that he could not recall there being any epidemic of staph infection at the WCDC.  If multiple inmates were having the same problem, ten, fifteen, or twenty of them, it would be cause for concern.  He testified inmates frequently do not take care of themselves as well as someone would who was "free world"--not incarcerated.

Dr. Mullins testified that he was contacted by phone by Nurse Bradley on May 15th, and he prescribed Cephalexin (Keflex), 500 mg., four times a day, for ten days.  *See Defts' Ex.* A-1 at 21.  According to Dr. Mullins, Cephalexin is a broad spectrum antibiotic used for skin infections.  He testified MRSA is resistant to penicillin.  He indicated that if an infection improves with an antibiotic, it is not resistant.

Although there was a doctor call on May 15th, no records could be located that indicate whether Dr. Mullins or Dr. Howard were present for it.  Doc. 71 at 1.  Inmate population during the year 2014 averaged 592 inmates per day.  *Id.*  Medication administration records (MARs)

-3-

indicate that on four occasion an "r" was entered indicating Plaintiff refused the dose of Keflex.[2] Doc. 73-1 at ¶ 4 & p. 4.

On May 17th, Plaintiff submitted a request to be seen at the hospital. *Id.* at 118. He indicated his leg was swollen like a "log" and the pain was unimaginable. *Id.* He also mentioned a lump under his left ear. *Id.* Later, that same day, he submitted a second request in which he said the swelling had gone down some but that he could use some bandages and something effective for the pain. *Id.*

Nurse Vickery contacted Dr. Mullins that same day. *Defts' Ex.* A-1 at 25. She noted Plaintiff had a large infected area. Dr. Mullins ordered a shot of Rocephen, another broad spectrum antibiotic. He testified though that two days was typically not enough time for an antibiotic to begin working. Plaintiff was given the shot the following day. *Id.*

On May 20th, Plaintiff put in a request for compensation for the staph infection he caught while he was in the jail. *Defts' Ex.* A-1 at 119. He also protested being charged for medical treatment. *Id.* He indicated his infected leg was swollen twice as large as his other leg and that he also had gotten an ear infection causing him to be unable to hear out of his left ear. *Id.* In response, Nurse Vickery told him that he did not have staph infection. *Id.* He was told that people get boils and that he probably would have gotten it if he was in jail or not. *Id.*

On May 22nd, Plaintiff submitted a request noting he was the fourth inmate to mysteriously get a boil. *Defts' Ex.* A-1 at 119. He asked for a break on the $43 in medical

---

[2]Dr. Mullins testified that an "r" means the Plaintiff refused a dose of medication. Defendants go on to state that "[r]egardless of whether that was by Russell's choice (to refuse the medications) or by some error by or decision of a nurse or a deputy who indicated Russell's refusal of the medication, [Dr.] Mullins prescribed an accepted course of treatment." Doc. 73 at 5.

-4-

charges.  *Id.*  According to Plaintiff, Nurse Vickery responded that almost every other person had been "doing meth."  *Id.*

On May 29th, Plaintiff submitted a request stating he did not know why he had been taken off antibiotics when his leg was not improving, was swollen down to his ankle, and had begun festering.  *Defts' Ex.* A-1 at 120.  Nurse Vickery responded that the oral antibiotics he was on "should be doing the trick."  *Id.*  However, Plaintiff testified that his antibiotics had run out at this point.   The MARs support Plaintiff's testimony.  Doc. 73-1 at p. 4-5.

On May 30th, Plaintiff submitted a request stating that his leg was swollen and red.  *Defts' Ex.* A-1 at 121.  He indicated he was worried about having a blood clot.  *Id.*  In response, he was put on the list to see the doctor.  *Id.*

On May 30th, Deputy Goggans submitted a report noting that Plaintiff's right ankle was swollen to two or three times larger than his left ankle.  *Defts' Ex.* A-1 at 27.  Deputy Goggans was unable to put ankle restraints on the Plaintiff because of the swelling.  *Id.*

Dr. Mullins testified that to be swollen two to three times its normal size the ankle would have to be as wide as the thigh.  He doubted the swelling was this significant.  Further, Dr. Mullins noted that the deputy reported the wound was scabbed over.  Dr. Mullins testified that scabbing indicates a wound is healing.  He further testified that once a wound is scabbed over, it cannot be cultured because you would not want to disturb the scab.

On May 31st, Plaintiff stated he was in a lot of pain and asked why he had been taken off Ibuprofen.  *Defts' Ex.* A-1 at 121.  He was put back on Ibuprofen.  *Id.*  Plaintiff testified that they would put him on Ibuprofen for only a week at a time.

On June 2nd, Plaintiff submitted a request asking why he had been taken off medication and stating he needed something for the infection. *Defts' Ex.* A-1 at 122. In response, he was told the prescription expired. *Id.* He was put on the list to see the nurse. *Id.*

Plaintiff was seen by Dr. Mullins on June 3rd. *Defts' Ex.* A-1 at 30. Dr. Mullins noted that the Plaintiff's chief complaint was a sore on his right leg and edema. *Id.* He noted swelling of 1 to 2 on a 4 or 5 point scale. *Id.* Dr. Mullins testified that neither the nurse nor the Plaintiff mentioned the possibility that it was a staph infection and he did not think of it as being a staph infection. However, Dr. Mullins did not write down a diagnosis. *Id.* Dr. Mullins testified that if he had believed it was a staph infection, he would have ordered the same treatment--a daily pressure dressing to cover the sore and avoid it spreading. *Id.* He also prescribed a different class of antibiotic, in this case Cleosin (Clindamycin) for twelve days, since the prior antibiotic had failed to clear the infection up. *Id.* Plaintiff was also prescribed a mild anti-depressant. *Id.* The MAR contains nine "R" notations with respect to the Cleosin. Doc. 73-1 at ¶ 5 & p. 5.

Dr. Mullins testified that he did not use narcotic pain medications in the WCDC. He indicated the use of narcotic pain medications was not recommended by the State for non-life threatening incidents. Instead, Dr. Mullins treated pain with Ibuprofen.

Dr. Mullins testified that the doctors did not see the medical requests submitted by the inmates. Instead, the nurses made the screening decision of whether or not the inmate should see the doctor. In his opinion, Plaintiff should have been seen by either Dr. Howard or himself at the next doctor's call. However, that did not occur. Between June 3rd and July 8th, there are no more notes made by Dr. Mullins.

On June 5th, Plaintiff submitted a request saying he was "in dire need of pain medication. My leg is killing me." *Defts' Ex.* A-1 at 123. Nurse Bradley responded that he was on Ibuprofen

-6-

600 mg., three times a day, per doctor's orders. *Id.* Plaintiff testified that he had not been receiving Ibuprofen but that after he submitted this request he did begin receiving Tylenol.

On June 14th, Plaintiff stated that whatever was on his leg had moved into his nasal passage and it was throbbing badly. *Defts' Ex.* A-1 at 126. In response, he was added to the list to see the nurse. *Id.*

On June 15th, Plaintiff asked to be seen by a doctor that day. *Defts' Ex.* A-1 at 126. He said his face was swollen "from my lip to my eyeball." *Id.* He indicated he was in great pain. *Id.* He indicated that he believed he needed to go to the hospital. *Id.* He stated it had been a month and he still had the same infected "quarter size sore" on his leg. *Id.*

Plaintiff was seen by Dr. Howard on June 17th. *Defts' Ex.* A-1 at 33. Plaintiff was placed on an antibiotic, doxycycline, for seven days. *Id.* The MAR indicates that Plaintiff did not get the first three doses and that Plaintiff is noted as having refused two other doses. Doc. 73-1 at ¶ 7 & p. 6.

On July 8th, Plaintiff was seen by Dr. Mullins and given an antibiotic, Keflex, and a Medrol dose pack for the swelling. *Defts' Ex.* A-1 at 40. Dr. Mullins did not write down any observations or a diagnosis. *Id.* He testified it was common for a doctor not to write down any observations. The MAR indicates Plaintiff refused nine doses of the Keflex and three doses of Medrol. Doc. 73-1 at ¶¶ 6 & 11 & p. 7-8

Dr. Mullins testified that if there had been a lot of swelling, he would have written something down. Dr. Mullins further testified that if he had been concerned that Plaintiff had a dangerous skin infection he would have written it down. In his view, it was simply a sore that had not healed, so in response he tried another type of antibiotic. Dr. Mullins indicated that if he believed the wound should have been cultured, he would have ordered a culture. Dr. Mullins

-7-

could not recall if he had been told that the Plaintiff was complaining the infection had spread to his nose and was oozing. He did not believe Plaintiff had complained about his nose.

Dr. Mullins acknowledged that he could have taken better notes. He also acknowledged that given all the different antibiotics that were tried, it might have been helpful to order a culture. He noted, however, that a culture did not always result in a specific bacteria being identified. He did not know what bacteria was causing the infection or the source of the infection. Dr. Mullins indicated that before seeing the Plaintiff on July 8th, he would have reviewed the chart and have known what Dr. Howard had prescribed. Dr. Mullins testified he could not say if the nasal infection was caused by the same bacteria as the wound on the leg.

The chart provided to the doctor consisted of the record from prior doctor's visits. Dr. Mullins testified that he could not recall seeing any nurses' notes. He was not sure the nurses' notes were available to him. He testified he reviews the doctors' notes.

Plaintiff testified that his leg would start getting better. He testified the steroids helped and the leg "would act like it was going to heal" and then "turn the other way." At this point, there was no boil but there was a big hole. Plaintiff testified he told Dr. Mullins about the redness, stinging, oozing, and throbbing.

Dr. Mullins testified that on July 15th, he checked the sore on Plaintiff's leg and it was not completely healed. He prescribed a shot of penicillin and added another antibiotic, Bactrim. *Defts' Ex.* A-1 at 26. Plaintiff testified he did not receive this antibiotic.

Dr. Mullins did not record any observations and testified he could not recall at all what he saw that day. He did, however, believe that if it was worse he would have written that down. Dr. Mullins did not write a diagnosis down either but testified he did not believe the Plaintiff's health was in danger.

-8-

Dr. Mullins testified that if the infection was in the Plaintiff's blood, Plaintiff would have had a high fever.  Dr. Mullins testified an infection could also spread from scratching.  Dr. Mullins noted that this was one of the reasons he ordered daily dressings.

Plaintiff testified that when he saw Dr. Mullins on July 15th, his leg was getting worse again.  Overall, Plaintiff indicated the swelling had gone down although he could not remember how much.  The hole had been getting smaller when he was on steroids.

Dr. Mullins next saw the Plaintiff on July 29th.  *Defts' Ex.* A-1 at 27.  That day, Plaintiff's chief complaint was that he was allergic to mustard.  *Id.*  Dr. Mullins did note that Plaintiff's right leg was better but that there was a green area in the center of necrosis (dead) tissue.  *Id.* Dr. Mullins cautioned that this was not an indication that the sore was getting worse.  Dr. Mullins ordered daily dressings, Bactrim (Septra) and Prednisone.  *Id.*  Plaintiff reported that he had not previously received the Bactrim prescribed on July 15th.  *Id.*  Plaintiff could not recall whether his leg was getting better or not at this point.

The MAR indicates the Plaintiff refused at least seven doses of Bactrim (Septra).  Doc. 73-1 at ¶ 9 & p. 9-12.[3]  Plaintiff also refused four doses of Prednisone.  *Id.* at ¶ 11 & p. 11.

Dr. Mullins' next visit with the Plaintiff was on August 12th.  *Defts' Ex.* A-1 at 29. Given that he had already tried a number of antibiotics, Dr. Mullins felt at this time that if it was not better, he had to try something else.  *Id.*  If the area of necrosis was not better by the following week, Dr. Mullins concluded he would have to debride it to get a fresh blood supply. He testified, however, that sometimes debriding can actually spread infection.  If Plaintiff had

---

[3]The handwritting on these two pages of MARs is difficult to read.  Doc. 73-1 at p. 9-10.  It is not clear if two of the entries identified by Dr. Mullins, evening doses on August 7th and 9th, are in fact "r" entries.  *Id.*

been getting worse, Dr. Mullins said his standard practice was to write that down.  Dr. Mullins admitted that Plaintiff still had a problem at this point.

Plaintiff testified he could not recall the condition of his leg during this visit.  He did testify that eventually it started getting better and skin started developing and closing up the sore.  He testified, however, if you pushed on the middle of the area it would sting badly.

On August 20th, Dr. Mullins prescribed Cephalexin, 500 mg, four times a day, for ten days.  Doc. 73-1 at ¶ 10.  The MAR indicates at least nine doses of medication were refused by the Plaintiff.[4]  *Id.* at p. 12.

Dr. Mullins did not see the Plaintiff again until October 7th.  *Defts' Ex.* A-1 at 32.  Dr. Mullins testified that in between these dates, he did not hear from Plaintiff.  Dr. Mullins testified that had Plaintiff been getting worse, the nurse would have called him.  Plaintiff's chief complaint this day was about his nose.  *Id.*  Dr. Mullins believes his notes said that Plaintiff's nose was itching but he admitted his notes were not very legible.  *Id.*  Reference to Plaintiff's medical request indicates he was complaining about having scabs in his nostrils.  *Defts' Ex.* A-1 at 150.  Dr. Mullins prescribed Ibuprofen for pain.  *Defts' Ex.* A-1 at 57.  Dr. Mullins checked Plaintiff's right leg and noted that it was healing.  *Id.*

Plaintiff testified his leg was better but that he was trying to get ointment because of the scab developing in his nasal passage.  Plaintiff stated that neither doctor ever looked in his nose.

On October 14th, Dr. Mullins testified the Plaintiff had a hand injury that was unrelated to any infection. Dr. Mullins testified that he never denied the Plaintiff any medically necessary care or treatment.  Dr. Mullins testified he gave the Plaintiff medically appropriate care using

---

[4]Once again the handwriting is difficult to read.  Doc. 73-1 at p. 12.  It is not clear if the entry on August 26th, at noon is in fact an "r" entry.

-10-

his best judgment.  Dr. Mullins further testified that what the Plaintiff had was not an abscess because an abscess has a collection of fluid in it.  According to Dr. Mullins, any type of infection can be resistant to antibiotics.  Dr. Mullins conceded it could have been a type of staph infection.  Covering the wound would have kept it from spreading.  Dr. Mullins also conceded that the infection might have been cured sooner if a culture had been taken.  Dr. Mullins testified that he never consulted Sheriff Helder about treatment decisions.

According to Dr. Mullins, "[a]nytime a patient starts an antibiotic and then stops it intermittently, it is more likely that he will develop a resistance to that particular drug.  This was part of the reason that I kept switching his antibiotic to prevent such a resistance and to treat the skin infection."  Doc. 73-1 at ¶ 12.

Plaintiff testified he was never given a diagnosis and eventually the sore closed up.  Plaintiff testified he still has a quarter size purple scar with discoloring around it from where the boil was.   He also testified that he still suffered from some pain.  Plaintiff testified that Exhibit B showed his swollen cheek.  *Plff's Ex.* B.  However, the quality of the photograph is not good and it not possible to visualize any swelling with any degree of certainty.  Plaintiff testified that he did not believe the wound on his leg was completely better until about November or December.

Southern Health Partners became the contract medical provider for the WCDC on November 1, 2014.  Doc. 72.  On November 1st, Dr. Saez discontinued Plaintiff's prescription for Aleve on an as needed basis.  Doc. 72-1 at 6.  On November 11th, November 12th, and November 20th, there are records indicating the Plaintiff refused his medication.  *Id.* at 7-9.

On November 21st, Plaintiff submitted a request asking for the new doctor to look at his leg.  *Id.* at 10.  He indicated the staph was mostly gone but the wound was not completely healed

-11-

and it still throbbed and hurt. *Id.* He also said he had a mole under his left armpit that was red, swollen, and painful. *Id.* Finally, he said he had an infected tooth. *Id.*

A nurse noted that he had two abscessed teeth with one tooth broken off completely at the gum line and another was broken off half way to the gum line. *Id.* That day, Dr. Saez prescribed Amoxillin, an antibiotic, twice a day, for ten days, and Motrin, twice a day, for seven days. *Id.*

On November 30th, an admission data and history physical form was completed. Doc. 72-1 at 12-13. On November 30th, Plaintiff complained of a boil on his face. *Id.* at 15. A nurse noted that he had a 2 cm circular redden hardened area on his face with no drainage. *Id.* It was tender to the touch and swelling was present. *Id.*

Plaintiff was prescribed Bactrim, twice a day for ten days, to start when Plaintiff completed taking the Amoxicllin, and he was prescribed an additional five days of Motrin. *Id.* at 14.

On December 2nd, a notation was made that Plaintiff had another boil. *Id.* at 16. Note was made that Plaintiff had been on numerous antibiotics. *Id.* He was put on the list to see the doctor on December 5th. *Id.*

Plaintiff testified that with respect to his face, he was seen by Dr. Saez on December 5th who noted a large 3 to 4 cm abscess on the right side of Plaintiff's face. Doc. 72-1 at 17. Dr. Saez directed that Plaintiff be taken to the emergency room. *Id.*

Plaintiff was sent to the emergency room at Physicians' Specialty Hospital. *Plff's Ex.* C. He was diagnosed with having a right facial abscess. *Id.* The abscess was lanced and packed. Doc. 72-1 at 18. Bactrim was prescribed. *Id.* at 19. The nurses were to change his packing. *Id.* at 18.

-12-

Plaintiff testified his leg was not examined during the emergency room visit. His face healed in a little over a week. Plaintiff testified he believed he was eventually diagnosed as having staph infection.

Plaintiff was seen again on December 12th, and it was noted that his facial abscess was resolving. Doc. 72-1 at 17. On December 23rd, Plaintiff submitted a request asking why he had not been to the dentist about his infected tooth. *Id.* at 23. He indicated the "pus pockets" were back and hurt tremendously. *Id.* That day, Plaintiff was seen by Dr. Saez. *Id.* at 24. Dr. Saez's notes are difficult to read but he indicates Plaintiff complained of bad anxiety. *Id.*

He was seen by Dr. Saez again on January 16, 2015, for complaints of anxiety and chest congestion. Doc. 72-1 at 26. He was given a prescription for anxiety and Robitussen. *Id.* at 27. Plaintiff was next seen by Dr. Saez on January 30th and treated for a fractured tooth and depression. *Id.* at 26. Plaintiff was prescribed Wellbutrin. *Id.*

Plaintiff testified he believed that if his leg would had been properly treated, it would not have spread to his nasal passage and his cheek. Plaintiff believes he should have been isolated and the infection cultured in accordance with the jail policy. Plaintiff has compiled a list of what he maintains are fifty-two inmates whose infection should have been isolated and cultured. *Plff's Ex.* D. Plaintiff testified that Sheriff Helder was responsible for setting the policy of the jail.

Dr. Howard testified he started working at the WCDC in July of 1999 and stopped working there when he retired in July of 2014. Every now and then, he would get a phone call even after he retired. If the nurses felt it was necessary, they would have an inmate taken to the emergency room.

Dr. Howard testified that he went to the jail once every other week unless he was out of town. In 2014, he went to the jail on Tuesdays. When he went to doctor call at the jail, the

-13-

nurse would hand him a doctor call sheet with the inmate's main complaint. Typically, he saw a number of patients sometimes seeing as many as seventy patients in a single day although that large a number was rare. Before he did anything with the patient, he would ask the patient what his problem was. Dr. Howard testified that very rarely would he consult anything else. He noted that the nurse was always present and would interject information.

Dr. Howard testified that typically the inmates' complaints were relatively minor involving scrapes, cuts, bruising, sore throats, and infections. Dr. Howard testified skin infections were the most common infection including strep infections. He testified strep infections could be treated by penicillin and any number of antibiotics.

He did not recall there being any significant number of staph infections at the jail. He testified that with a staph infection he would typically prescribe Keflex since it could be given over a longer period of time.

If he prescribed a patient medication, and the patient was doing well, Dr. Howard indicated he did not need to see the patient again. The decision was left to the nurse. When medication was prescribed, Dr. Howard hoped for improvement in about five days.

In Dr. Howard's opinion, from May to November or December was not a long period of time for a bad infection in a leg to be treated. He testified the main reason was because of the poor circulation in the leg. Over that period of time, he indicated you would want to change up the antibiotics.

Dr. Howard testified that cultures will point out some antibiotics that should be helpful. However, he indicated he has seen it not work. He pointed out that bacteria gets under the skin and causes the infection. The infection may cause swelling, soreness, and fever although not always. If the infection gets in the blood, it can cause septicemia.

-14-

Dr. Howard testified he only saw the Plaintiff a single time on June 17, 2014.  *Defts' Ex. A-1 at 33.*  Dr. Howard testified his "gut feeling" was that Plaintiff had developed a skin infection from having a sinus infection.  Dr. Howard conceded, however, that he did not notice any sinus drainage present.  He indicated it was the liquid that typically caused the irritation.  Dr. Howard testified that he really had no idea how the Plaintiff got the infection.

Dr. Howard's diagnosis was a skin infection in the left nasal passage.  *Id.*  Dr. Howard testified he did not see anything serious--no abscess and no boil.  In fact, he stated he could probably have gotten by without prescribing an antibiotic.  He indicated he did not see anything to suggest it was a staph infection or that a culture was necessary.  Dr. Howard testified that you could not get an accurate culture from a sore because you would end up with skin flora.  Instead, a culture was taken when there was liquid present that could be drained.  He prescribed doxycycline which is in the tetracycline family and can be tolerated for long periods of time.

Dr. Howard did not know anything about Plaintiff having an infection on his leg.  Dr. Howard testified he did not believe the nasal infection was related to the leg infection.  He indicates that covering an infected area was the best method they had to keep it from spreading.  Dr. Howard testified that when a sore scabs over that means it is healing.

Dr. Howard testified that he could not recall ever lancing a boil at the jail.  He knew that the nurses did it sometimes.  If the nurses felt uncomfortable doing it, they would send the inmate to the surgical clinic.

Dr. Howard testified that it would have been important to have known about the Plaintiff's prior treatment for his leg.  Dr. Howard did not recall any discussion with the nurse about the Plaintiff.  If he had known about Plaintiff's prior history, Dr. Howard doubted he

-15-

would have prescribed more antibiotics.  He testified that when he saw an inmate for something minor he did not review the history.  He concentrates on what the patient tells him about.

Dr. Howard testified he never consulted the Sheriff regarding medical treatment.  To him, cost was not a big factor in deciding appropriate treatment.  He did note, however, that he would prescribe generic brands of medication if at all possible.

Plaintiff testified that with respect to his visit on June 17th with Dr. Howard, that the boil in his nose had burst so there was only a sore present.  He testified that he pretty much told Dr. Howard that he did not know what it was but that he was in a lot of pain.  Plaintiff indicated he did tell Dr. Howard that it had popped and drained.  Plaintiff testified that the nurses were present when he saw Dr. Howard but he could not recall if they added anything.

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "A case founded on speculation

-16-

or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

**3.  Discussion**

Defendants argue they are entitled to summary judgment on the following grounds: (1) Dr. Mullins was not deliberately indifferent to the Plaintiff's medical needs; (2) the Defendants are entitled to qualified immunity; (3) there is no proof of any personal involvement on the part of Sheriff Helder; and (4) there is no basis for official capacity liability.

**(A). 1983**

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. West v. Atkins, 487 U.S. 42 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).

**(B).  Medical Treatment**

Prisoners and pretrial detainees are protected under the Constitution from a state actor's deliberate indifference towards the inmate's serious medical needs.  See Corwin v. City of Independence, No. 15-1732, 2016 WL 3878216, *2 (8th Cir. July 18, 2016)   To prevail on a denial of medical care claim, the Plaintiff must show: (1) the existence of an objectively serious medical need; (2) that Defendants knew of and deliberately disregarded.  Vaughn v. Gray, 557 F.3d 904, 908-09 (8th Cir. 2009).

-17-

This case hinges on whether the Defendants exhibited the requisite mental state. Defendants' mental state must be akin to "criminal law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate . . . .  Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision."  Schaub v. VonWald, 638 F.3d 905, 914-15 (8th Cir. 2011)(internal quotation marks and citations omitted).      This standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (constitutional violation cannot rest on mere disagreement with treatment decisions); Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (inmates have no constitutional right to particular course of treatment, and doctors are free to use their own medical judgment); Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors not deliberately indifferent where they treated the prisoner and offered sensible medication). Similarly, "[m]erely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." Jackson v. Buckman, 756 F.3d 1060, 1065-66 (8th Cir. 2014) (citations omitted).  To constitute deliberate indifference, "[a]n inmate must demonstrate that a prison doctor's actions were so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." Id. at 1066 (internal quotation marks and citation omitted).

**(C).  Dr. Mullins**

It is undisputed in this case that the Plaintiff had a serious medical need.  Clearly, he had a condition that caused him considerable discomfort and required treatment over a number of

-18-

months.  The issue is whether Dr. Mullins acted with the requisite culpable mental state, *i.e.,* deliberate indifference.

The following facts are undisputed:

Dr. Mullins saw the Plaintiff regarding his infection on his leg on five separate occasions between June 3rd and August 12th and prescribed a variety of medications including antibiotics, steroids, and pain relievers;

Dr. Mullins also prescribed medication for the leg infection, after being contacted by a nurse, on three occasions beginning on May 15th and ending on August 20th;

Dr. Mullins checked the Plaintiff's leg on October 7th during a visit at which Plaintiff's chief complaint was regarding an infection in his nose;

No culture was taken by Dr. Mullins;

Plaintiff did not receive all medication prescribed to him by Dr. Mullins;

Dr. Mullins did not review the Plaintiff's medical requests submitted via the electronic kiosk;

Between August 20th, when Dr. Mullins prescribed the Plaintiff an antibiotic, and October 7th, Dr. Mullins did not hear from the Plaintiff or the nurse regarding the Plaintiff's leg infection;

Plaintiff testified that his leg wound would start to get better with medication and then would get worse again and was not completely healed until November or December.

There are perhaps a number of things Dr. Mullins could have done differently.  However, it is not the Court's job to second guess medical professionals.  See e g. Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)(prison doctors remain free to exercise their independent medical judgment).  This is not a case where Dr. Mullins failed to treat the Plaintiff. *Id.* (Failure to treat a condition may constitute deliberate indifference when the official "knew the condition created an excessive risk to the inmate's health and failed to act on that knowledge").

-19-

Neither mere negligence nor medical malpractice is sufficient to establish a constitutional violation. Estelle v. Gamble, 429 U.S. 97,104-05 (1976). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 105-06.

It is true that Dr. Mullins admitted that a culture may have assisted in identifying the cause of the infection and the appropriate antibiotic to be used for treatment. However, the question of what type of diagnostic tests should be performed lies within the exercise of a doctor's professional judgment and does not constitute deliberate indifference. Estelle, 429 U.S. at 107-108 ("But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter of medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment"); see also Wooler v. Hickman County, Kentucky, No. 5:05-cv-247, 2008 WL 5412826, *25 (W.D. Ky. Dec. 30, 2008)(decision not to obtain a culture of an infection was "merely an exercise of the doctor's medical discretion").

With respect to the fact that Plaintiff was not administered all medication he was prescribed by Dr. Mullins, there is nothing in the record that suggests Dr. Mullins was involved in anyway in the distribution of medication within the WCDC. See e.g., Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006)(Plaintiff produced no evidence that the doctor was responsible for administering medication). In fact, the MARs appear to indicate that the nurses and deputies were responsible for administration of medication.

"In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, 132 F.3d

-20-

at 1240.  I cannot say that the Plaintiff has proffered evidence from which a jury could conclude that Dr. Mullins "provid[ed] care that was so grossly incompetent or inadequate as to amount to no care at all." Martinson v. Leason, 22 F. Supp. 3d 952, 961 (D. Minn. 2014); see also Banks v. County of Allegheny, 568 F. Supp. 2d 579, 584-85 (W.D. Pa. 2008)(treatment of MRSA infection did not amount to deliberate indifference where prisoner was not denied treatment and received treatment reasonably aimed at curing his MRSA infection); Wooler, 2008 WL 5412826, *23-24 (treatment of a MRSA infection with various antibiotics, the doctor believed would be effective, and were effective in most instances, over a period of time from December of 2004 to September of 2005 did not rise to the level of deliberate indifference).

Cases in which the care has been found to be grossly incompetent involve situations much more egregious than that presented here.  See e.g., Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010)(ongoing severe stomach pain and vomiting blood for which plaintiff repeatedly complained and submitted grievances, but was only given antacid tablets); Warren v. Fanning, 950 F.2d 1370, 1373 (8th Cir. 1991)(complaints of foot pain over 14 months and black toenails treated with "patient reassurance").   Dr. Mullins is entitled to summary judgment in his favor.

Having found that the facts do not make out a constitutional violation, Dr. Mullins is entitled to qualified immunity.  See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(D).  Sheriff Helder--Supervisory Capacity**

With respect to Sheriff Helder, Defendants argue that Sheriff Helder did not have any personal involvement in the Plaintiff's medical treatment and he is therefore entitled to summary

AO72A
(Rev. 8/82)

judgment in his favor.  I agree.  The Plaintiff's claims against Sheriff Helder are totally conclusory.  Plaintiff has not asserted any factual basis for a claim against Sheriff Helder except for his overall responsibility for the jail and for having a trained staff.  Nothing in the record before the Court suggests any personal involvement by Sheriff Helder in any alleged constitutional violations.

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  See Monell v. Dep't of Social Servs., 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  White v. Holmes,  21 F.3d 277, 280 (8th Cir. 1994); see also Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006)); Keeper, 130 F.3d at 1314 (no evidence that the defendants were doctors or were personally involved in making medical

-22-

decisions about treatment); <u>Mark v. Nix</u>, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility).

There are no allegations that Sheriff Helder was involved in anyway with the decision of whether the Plaintiff should receive medical treatment, the type of medication he should be prescribed, what tests should be ordered, or whether he should be taken to the hospital for treatment.   Plaintiff did not communicate in anyway with Sheriff Helder regarding his grievances or complaints about his treatment.  Sheriff Helder is entitled to judgment in his favor on the individual capacity claim.

Further, having found that the facts do not make out a constitutional violation, Sheriff Helder is entitled to qualified immunity.  <u>See, e.g., Krout</u>, 583 F.3d at 564.

**(E).  Official Capacity Claims**

Finally, Defendants argue there is no basis for an official capacity claim.  Defendants note that Plaintiff has not pointed to any unconstitutional county policy or custom.  I agree.  An official capacity claim "is functionally equivalent to a suit against the employing governmental entity." <u>Veatch v. Bartels Lutheran Home,</u> 627 F.3d 1254, 1257 (8th Cir. 2010).  In other words, the official capacity claim is treated as a claim against Washington County. <u>See Murray v. Lene</u>, 595 F.3d 868, 873 (8th Cir. 2010).

"A municipality can be liable under § 1983 only if a municipal policy or custom caused a plaintiff to be deprived of a federal right." <u>Alexander v. Hedback</u>, 718 F.3d 762, 766 (8th Cir. 2013)(citations omitted).  "A governmental policy involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who has the final authority to establish governmental policy." <u>Brockinton v. City of Sherwood</u>, 503 F.3d 667, 674

-23-

(8th Cir. 2007) (internal quotations and citations omitted).  A "custom involves a pattern of persistent and widespread . . . practices which become so permanent and well settled as to have the effect and force of law."  Id.

"[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  "Moreover, the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional."  Luckert v. Dodge County, 684 F.3d 808, 820 (8th Cir. 2012) (internal quotation marks and citation omitted).  Here, Plaintiff makes no such showing.  There is no basis on which Washington County may be held liable.

### 4.  Conclusion

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 55) be **GRANTED and the CASE DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

-24-

DATED this 25th day of July 2016.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)